# Effective Date of the Reporting Requirement Imposed by the Multinational Force in Lebabon Resolution

The three-month reporting requirement imposed by § 4 of the Multinational Force in Lebanon Resolution (Lebanon Resolution) commenced as of the date of enactment of that Resolution, October 12, 1983. The specification in § 4 of the Lebanon Resolution that reports should be made "[a]s required by section 4(c) of the War Powers Resolution" is intended to incorporate only the reporting obligation, not the timing mechanism, set forth in the War Powers Resolution.

December 21, 1983

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This confirms our oral advice to you in response to your request for our views on when the President must submit to Congress the first of the periodic reports on the situation in Lebanon that are required by § 4 of the Multinational Force in Lebanon Resolution, S.J. Res. 159 (Oct. 12, 1983) ("Lebanon Resolution"). That section requires the President to submit certain information to Congress on the situation in Lebanon "as required by section 4(c) of the War Powers Resolution [50 U.S.C. § 1543(c)] . . . but in no event shall he report less often than once every three months." In full text, the section reads as follows:

> As required by section 4(c) of the War Powers Resolution, the President shall report periodically to the Congress with respect to the situation in Lebanon, but in no event shall he report less often than once every three months. In addition to providing the information required by that section on the status, scope, and duration of hostilities involving United States Armed Forces, such reports shall describe in detail —
>
> (1) the activities being performed by the Multinational Force in Lebanon;
> (2) the present composition of the Multinational Force in Lebanon, including a description of the responsibilities and deployment of the armed forces of each participating country;
> (3) the results of efforts to reduce and eventually eliminate the Multinational Force in Lebanon;
> (4) how continued United States participation in the Multinational Force in Lebanon is advancing United States foreign policy interests in the Middle East; and

197

(5) what progress has occurred toward national political reconciliation among all Lebanese groups.

For the reasons discussed below, we conclude that the three-month reporting requirement set forth in the Lebanon Resolution began to run upon enactment of the Resolution on October 12, 1984, and therefore the first report will be due three months from that date, on January 12, 1984.[1]

The Lebanon Resolution does not expressly state that the three-month reporting period commences on a particular date. Therefore, we would ordinarily conclude that the reporting period would commence as of the date of enactment of the Resolution. *See generally United States* v. *Commonwealth Auto Sales, Inc.,* 463 F. Supp. 12, 13 (M.D. Pa. 1978). However, because § 4 specifies that the reports should be made "as required by the War Powers Resolution," and Congress in § 2(b) of the Lebanon Resolution purported to "determine . . . that the requirements of section 4(a)(1) of the War Powers Resolution became operative on August 29, 1983," we must look at the question more closely.

Section 4(c) of the War Powers Resolution requires that, "whenever United States Armed Forces are introduced into hostilities or into any situation described in subsection (a) of this section, the President shall . . . report to the Congress periodically on the status of such hostilities or situation as well as on the scope and duration of such hostilities, but in no event shall he report to the Congress less often than once every six months." 50 U.S.C. § 1543(c).[2] As indicated in note 1, *supra*, Senator Byrd has taken the position that the three-month period imposed by § 4 of the Lebanon Resolution began to run on August 29, 1983. This position appears to be based on the argument that the

[1] The occasion for your request is a letter to the President from Senator Byrd of December 5, 1983, in which Senator Byrd takes the position that the three-month period specified in the Lebanon Resolution began to run on August 29, 1983, rather than on October 12, 1983. We note that pursuant to the President's letter to Speaker O'Neill of October 19, 1983, in which the President stated his intention to submit the reports required by S.J. Res. 159 "no less frequently than once every sixty days," a report dated December 14, 1983 was transmitted to the Speaker and the President *pro tempore* of the Senate by the President. Although not directly relevant to the point at issue, we observe that if Senator Byrd's interpretation of § 4 of S.J. Res. 159 were correct, then the first report would have been due, under the President's October 19, 1983 letter, on October 27, only two weeks after S J. Res. 159 became law. Thus, according to Senator Byrd's interpretation, the President would presumably be viewed by the Speaker as having failed to honor his intention, expressed on October 19, to report at sixty-day intervals. However, if Speaker O'Neill had understood the President to have promised the first report by October 27, it must be assumed that the Speaker would have expressed his concern shortly after October 27. We are unaware that any such concern has been expressed.

[2] The situations described by subsection (a) include any case in which United States Armed Forces are introduced, in the absence of a declaration of war, —

    (1) into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances;

    (2) into the territory, airspace or waters of a foreign nation, while equipped for combat, except for deployments which relate solely to supply, replacement, repair, or training of such forces; or

    (3) in numbers which substantially enlarge United States Armed Forces equipped for combat already located in a foreign nation.

50 U.S.C. § 1543(a). We note that neither § 1543(a) nor § 1543(c) requires that the President specify the subsection under which information is being provided. Reports to Congress, which have generally been characterized as "consistent with" the War Powers Resolution, have traditionally not specified the subparagraph of subsection (a) that may arguably have been triggered by the particular facts and circumstances involved.

language in that section, "[a]s required by section 4(c) of the War Powers Resolution," expresses a congressional intent that the three-month reporting period began to run on August 29, 1983, the date recited by Congress in § 2(b) of the Lebanon Resolution as the operative date on which, according to the Congress, § 4(a)(1) of the War Powers Resolution was triggered with respect to Lebanon.[3] Under this interpretation, the first report on the situation in Lebanon would have been due on November 29, 1983.

This interpretation of the Lebanon Resolution assumes that the reporting requirement imposed by § 4 of the Resolution was not intended to be an independent obligation imposed in the context of the compromise worked out between the Executive and Legislative Branches, but rather was intended only to supplement § 4(c) of the War Powers Resolution by requiring § 4(c) reports to include certain additional categories of information and to be submitted at three-month, rather than six-month, intervals.

We believe, however, that the reporting obligation imposed by § 4 of the Lebanon Resolution must be interpreted in light of the full text, background, and legislative history of that Resolution. Seen in context, we believe the three-month reporting requirement stands alone as an independent reporting obligation imposed with respect to the situation in Lebanon, an obligation linked directly to the eighteen-month authorization by the Lebanon Resolution for participation of United States Armed Forces in the Multinational Force in Lebanon.

We reach this conclusion for several reasons. First, we observe that the authority provided by § 6 of the Lebanon Resolution for the participation of United States Armed Forces in the Multinational Force in Lebanon extends for an eighteen-month period commencing with the date of enactment of the Resolution.[4] Thus, at the only point in the Lebanon Resolution at which Congress specifically focused on the commencement of a time period, Congress chose to have the time period commence on the date of enactment of the Resolution itself. Congress could, of course, have chosen to commence the eighteen-month authorization as of August 29, but it did not do so. We believe it is both logical and reasonable to conclude that Congress contemplated that the reports to be submitted pursuant to the terms of the Lebanon Resolution would be submitted in phase with the eighteen-month authorization — *i.e.,* at three-month intervals at the end of the third, sixth, ninth, twelfth, fifteenth, and eighteenth months of the authorization.

Second, there is no suggestion in the congressional debates or reports accompanying enactment of the Lebanon Resolution that Congress intended the three-month period to run from August 29, 1983. We have been unable to

[3] We note that in signing S.J. Res. 159 into law, the President specifically stated that he did not "necessarily join in or agree with" some expressions of Congress in that Resolution, including "the congressional determination that the requirements of section 4(a)(1) of the War Powers Resolution became operative on August 29, 1983."

[4] In signing S.J. Res. 159 into law, the President stated that § 6, providing an eighteen-month authorization for deployment of United States Armed Forces in Lebanon, should not "be interpreted to revise the President's constitutional authority to deploy United States Armed Forces."

199

locate in that legislative history any specific discussion of when the periodic reporting requirement with respect to Lebanon would commence. Debate over the reporting requirement focused only on the length of the interval between reports. Draft resolutions in both the House and Senate initially provided for a six-month reporting period but, because of concerns about the volatility of the situation in Lebanon and the perceived need for more frequent information, both Houses agreed upon a three-month reporting period. *See, e.g.,* S. Rep. No. 242, 98th Cong., 1st Sess. 9–10 (1983); 129 Cong. Rec. 26036 (1983) (remarks of Senator Mathias); *id.* at 26145 (1983) (text of H.R.J. Res. 364); *id.* at 26494 (1983) (remarks of Rep. Zablocki). These congressional discussions concerning the reporting period do not suggest in any way that the commencement of the period would be triggered as of the date Congress "determined" in the same resolution that § 4(a)(1) of the War Powers Resolution had been triggered — *i.e.,* as of August 29, 1983 — rather than as of the date of enactment of the Resolution.

Third, the language of early House and Senate draft resolutions that would have imposed a six-month reporting period suggests strongly that Congress did not contemplate that its determination regarding the operative date for triggering of the War Powers Resolution, August 29, 1983, would also commence the running of the time for the reporting requirement imposed by the Lebanon Resolution. Those drafts provided, in much the same language as was ultimately used in S.J. Res. 159, that the reports were to be submitted "[a]s required by section 4(c) of the War Powers Act . . . *but in no event shall he report less often than once every six months." See* 129 Cong. Rec. 26145 (1983) (text of H.R.J. Res. 364); S. Rep. No. 242, *supra,* at 30–31 (text of S.J. Res. 166) (emphasis added). If the drafters had intended that the time for submission of reports under the proposed Lebanon Resolution would begin to run on August 29, it would not have been necessary to specify that the reports be submitted at six-month intervals, since that requirement was already provided in § 4(c) of the War Powers Resolution, and the language imposing the six-month requirement therefore would have been completely superfluous.[5] What Congress must have contemplated was that the six-month period, later reduced to three months, would commence at the same time as the eighteen-month authorization.

---

[5] It could, of course, be argued that this six-month requirement was inadvertently included in bills such as H.R.J. Res. 364 by drafters unaware that § 4(c) of the War Powers Resolution already required semiannual reporting. However, it must be remembered that H.R.J. Res. 364 was authored by the late Chairman Zablocki of the House Committee on Foreign Affairs, who was also a prime drafter and sponsor of the War Powers Resolution in 1973. Chairman Zablocki's introductory remarks explaining the provisions of H.R.J. Res. 364 to his colleagues on the floor of the House on September 28, 1983, make quite clear that he viewed the reporting requirement of H.R.J. Res. 364, which was then a six-month requirement, as independent from the reporting obligation imposed by § 4(c) of the War Powers Resolution. He stated that H.R.J. Res. 364 "[r]equires a semiannual reporting requirement on the status, scope and duration of hostilities involving U.S. forces." 129 Cong. Rec. 26112 (1983). To accept Senator Byrd's suggested reading of the Lebanon Resolution would require us to conclude that Chairman Zablocki did not understand the terms of § 4(c) of the War Powers Resolution, and to disregard this important evidence of congressional intent, neither of which we are prepared to do.

200

Our interpretation does not render superfluous the language "[a]s required by section 4(c) of the War Powers Resolution" used in § 4 of the Lebanon Resolution. That language can reasonably be understood to incorporate by reference the substantive obligation set forth in § 4(c) of the War Powers Resolution for the submission of reports on the status, scope, and duration of hostilities described in § 4(a) of the War Powers Resolution. It need not necessarily — and we believe should not — be interpreted to incorporate, in addition, the timing mechanism of the War Powers Resolution. Moreover, § 4 of the Lebanon Resolution actually reiterates those substantive requirements of § 4(c) of the War Powers Resolution, which we believe is further evidence of Congress' intent that § 4 of the Lebanon Resolution be a separate, independent reporting requirement tailored to the unique circumstances of the situation in Lebanon.[6]

Finally, we believe that directly linking the specific reporting requirement imposed by § 4 of the Lebanon Resolution to the date determined by Congress to be the operative date for invocation of the War Powers Resolution would threaten to undercut the compromise reached by the Executive and Legislative Branches on the underlying constitutional controversy surrounding application of the War Powers Resolution to the situation in Lebanon. We view the reporting requirement imposed with respect to Lebanon to be part of that overall compromise, which was engineered to avoid perhaps irreconcilable conflict between those Branches in the context of an ongoing crisis. Given this background, and in the absence of any persuasive language or legislative history to the contrary, we conclude that the three- month reporting requirement imposed by § 4 of the Lebanon Resolution commenced as of the date of enactment of that Resolution, October 12, 1983.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[6] We note in this regard that the legislation at issue here was truly unique in that no similar legislation had ever been considered and adopted by Congress since the enactment of the War Powers Resolution in 1973.